## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CCA OF TENNESSEE, LLC,**<br><br>                  **Plaintiff,**<br><br>**v.**<br><br>**THOMAS E. PEREZ, SECRETARY, UNITED STATES DEPARTMENT OF LABOR, DAVID WEIL, ADMINISTRATOR, WAGE AND HOUR DIVISION, UNITED STATES DEPARTMENT OF LABOR, AND UNITED GOVERNMENT SECURITY OFFICERS OF AMERICA, LOCAL 315,**<br><br>               **Defendants.** | No. 15–cv–3164 (KM)(MAH)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

CCA of Tennessee, LLC ("CCA"), commenced this action to enjoin a Department of Labor ("DOL") Administrative Law Judge ("ALJ") from holding a hearing. The stated purpose of the hearing is to determine whether the wage rate collectively bargained for and agreed to between CCA and the United Government Security Officers of America, Local 315 ("UGSOA") substantially varies from prevailing wages in the locality. CCA alleges in its complaint (ECF No. 1) that the hearing is not authorized by the Service Contract Act ("SCA"), 41 U.S.C. §§ 6701–6707, and thus would be *ultra vires*. The defendants, in addition to UGSOA, are Thomas E. Perez, DOL Secretary, and David Weil, Administrator of DOL's Wage and Hour Division of the DOL. (Herein, the designation "DOL" shall include the Department, Perez, and Weil.) After filing the complaint, CCA immediately moved for summary judgment. (ECF No. 4) Perez and Weil opposed summary judgment and cross-moved to dismiss CCA's

1

complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) or in the alternative for summary judgment in their favor. (ECF Nos. 26, 27).[1] Now before the court are that motion to dismiss and the cross-motions for summary judgment.

The question presents itself as a dispute over wages and benefits. It narrows down, however, to the question of whether a district court may intervene in that dispute—in particular, whether this court has jurisdiction to enjoin an administrative hearing. I conclude that, whatever the merits of the underlying hourly wage issue, this Court lacks jurisdiction to enjoin the DOL from hearing the dispute. CCA's contentions, whether right or wrong, should be asserted in the administrative proceedings and on appeal from any adverse final agency action.

For the reasons set forth below, the motion of the DOL to dismiss the complaint is GRANTED. The parties' motions for summary judgment are therefore DISMISSED as moot.

---

[1] UGSOA has not responded to the complaint, but none of CCA's requested relief was directed at UGSOA. (*See* Compl. Counts 1–3)

2

# I.   BACKGROUND[2]

## A. Parties

CCA is a federal government contractor that provides detention services for Immigration and Customs Enforcement ("ICE") at a detention center in Elizabeth, New Jersey. (Compl. ¶1)

Perez is the Secretary of Labor, and is being sued in his official capacity. (*Id.* ¶2) David Weil is the Administrator of the Wage and Hour Division of the DOL. (*Id.* ¶3) (Perez and Weil are sued in their official capacities and, as noted above, I will for convenience include them in the designation "DOL".)

UGSOA is the labor organization certified to bargain as an agent for the Elizabeth detention center's officers. (*Id.* ¶4) UGSOA was elected to represent the detention officers in February 2012, after they decertified their previous representative. (*Id.* ¶21)

## B. Collective Bargaining Agreement

In 2013, UGSOA and CCA negotiated a new collective bargaining agreement increasing detention officer wage rates from $20.00 per hour under the predecessor agreement to $20.40 in 2013, $20.71 in 2014, and $21.02 in 2015. (*Id.* ¶¶20–22) That new agreement provided for wage reopeners in 2014 and 2015, permitting renegotiation of the wages for those years. (Pl. Statement

---

[2] Most of the following facts are taken from the complaint or documents (such as the collective bargaining agreement) on which the claims in the complaint are explicitly based. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("what is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited"). They are assumed to be true solely for the purposes of the motion to dismiss. *See Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358(3d Cir. 2014) ("a facial [Rule 12(b)(1)] attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6)"); Section III.A, *infra.* For background, some of the following facts are taken from plaintiff's summary judgment motion, but I have included no facts that, even at this early stage, are disputed.

of Undisputed Facts ("PSUF") ¶11 (ECF No. 4–3); Def. Resp. to PSUF and Statement of Undisputed Facts ("DSUF") ¶11 (ECF No. 26–3))

## C. Procedural History

In September 2014, UGSOA requested a substantial variance hearing from the Wage and Hour Division pursuant to the SCA. (*See* Compl. ¶23; Decl. of Paul T. McGurkin to Pl. Mot. Summ. J. ("McGurkin Decl.") Ex. 5 (Request for Substantial Variance Hearing (Sept. 16, 2014)) (ECF No. 4–5); DSUF ¶17) In that request, UGSOA represented that the federal prevailing wage for the area was $30.97. (McGurkin Decl. Ex. 5 at 3; DSUF ¶17)

Weil agreed with UGSOA that there was evidence warranting submission to an ALJ and signed an "Order of Reference" authorizing a substantial variance hearing by an ALJ under the SCA, 41 U.S.C. § 6707(c). (Compl. ¶24; *see* McGurkin Decl. Ex. 6 (Order of Reference (Feb. 3, 2015))). Plaintiff moved before the ALJ to dismiss the Order of Reference, arguing that the SCA does not permit a substantial variance hearing under these circumstances. (Compl. ¶25) Then, as here, CCA principally relied on *Gracey v. Int'l Bhd. of Elec. Workers*, 868 F.2d 671, 672 (4th Cir. 1989). (*See* McGurkin Decl. Ex. 7 (ALJ Order Denying Motion to Dismiss (April 21, 2015))) The ALJ dismissed the motion because it was "bound by the [Administrative Review Board]'s decision" to limit the application of the holding in *Gracey* to its Circuit of origin, the Fourth Circuit. (*Id.* at 2 (citing *United Government Security Officers of America, Local 114,* ARB 02–012, 2003 WL 22312701, at *5–6 & n.5 (Dep't of Labor Sept. 29, 2003)))

On May 5, 2015, CCA filed this action for a declaratory judgment, injunction, or mandamus to stop the substantial variance hearing from taking place. (Compl. Counts 1–3) In essence, CCA urges that the SCA does not authorize a substantial variance hearing under the circumstances present here.

## II.   THE SCA AND THE PARTIES' INTERPRETATIONS

### A. The Service Contract Act Scheme

The Service Contract Act (SCA), 41 U.S.C. §§ 6701–6707,[3] first enacted in 1965, covers employees of certain entities contracting with federal agencies. The Senate's stated purpose for enacting the SCA was "to provide labor standards for the protection of employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal agencies.... the only remaining category of Federal contracts to which no labor standards protection applies." S. Rep. No. 89–798, at 1 (1965), *reprinted in* 1965 U.S.C.C.A.N. 3737, 3737. The SCA provides, *inter alia,* that contracts to which it applies must specify the minimum wage (and fringe benefits) to be paid to each class of service employee. 41 U.S.C. §§ 6703–6704. As enacted in 1965, the SCA required that the minimum wage rates be set in accordance with prevailing rates in the locality. *See Curtiss-Wright Corp. v. McLucas,* 364 F. Supp. 750, 768 (D.N.J. 1973).

Much of the language at issue in this case, however, was the product of 1972 amendments to the SCA. Legislative history states, and it is readily inferable from the statute itself, that those amendments were intended to balance "the dual objectives of protecting the service worker and safeguarding other legitimate interests of the federal government." S. Rep. No. 92–1131, at 3 (1972), reprinted in 1972 U.S.C.C.A.N. 3534, 3537–38. To put it more bluntly,

---

[3] Until 2011, the SCA was codified at 41 U.S.C. §§ 351–358, and was worded somewhat differently from the current version. It was amended in 2011, but the intent of those amendments was only "to conform to the understood policy, intent, and purpose of Congress in the original enactments, with such amendments and corrections as will remove ambiguities, contradictions, and other imperfections." Public Contracts—Enact Certain Laws, Pub. L. 111–350, 124 Stat. 3677 (2011). No change in the substantive law was intended. *See* 155 Cong. Rec. H5201–01 (daily ed. May 6, 2009) (Statement of Rep. Cohen) ("these changes are not intended in any way to have any substantive effect, simply procedural, and make the code more easily used").

Congress wanted to protect workers and respect collective bargaining, but on the other hand did not want the government to overpay for services.

Those 1972 amendments included (1) the addition of a collective bargaining option to the minimum wage and fringe benefit specification requirements; (2) a predecessor-contract wage floor; and (3) a substantial variance exception. *See* Pub. L. No. 92–473, 86 Stat. 789 (1972).[4]

Number 1, the collective bargaining option, was appended to the minimum wage provision. That provision, as currently worded, now comprises two options: it requires a wage rate (a) "in accordance with prevailing rates in the locality" as determined by the Secretary of Labor, or (b) in accordance with a collective bargaining agreement arrived at "as a result of arm's length negotiations."[5] 41 U.S.C. § 6703(1) (current codification); *see* 86 Stat. at 789.

Numbers 2 and 3, the predecessor-contract wage floor and the substantial variance exception provisions, likewise remain in the SCA today. They are currently codified at 41 U.S.C. § 6707:

**§ 6707. Enforcement and administration of chapter**

....

(c) Preservation of wages and benefits due under predecessor contracts.—

(1) In general.—Under a contract which succeeds a contract subject to this chapter, and under which substantially the same services are furnished, a contractor or subcontractor may not pay a service employee less than the wages and fringe benefits the service employee would have received under the predecessor contract, including accrued wages and fringe benefits and any prospective increases in wages and fringe benefits provided for

_____

[4] For further information regarding the enactment and legislative history of the SCA and the 1972 amendments, *see generally McLucas*, 364 F. Supp. at 768–69 & n.16; *Gracey*, 868 F.2d 671 (majority and dissent); *Am. Mar. Officers v. Hart*, No. C.A.99–1054 (WBB), 1999 WL 33839612 (D.D.C. Oct. 14, 1999).

[5] Similar collective bargaining language was inserted into the requirement for fringe benefit specifications. 41 U.S.C. 6703(2); *see* 86 Stat. at 789. In this opinion, references to "wages" or "wage rates" should be understood to include fringe benefits.

in a collective-bargaining agreement as a result of arm's-length negotiations.

(2) Exception.—This subsection does not apply if the Secretary finds after a hearing in accordance with regulations adopted by the Secretary that wages and fringe benefits under the predecessor contract are substantially at variance with wages and fringe benefits prevailing in the same locality for services of a similar character.

41 U.S.C. § 6707(c).

Section 6707(c)(1) thus creates a "wage floor." It requires that new contracts pay no less than the wages and benefits that the employees were due to receive under a predecessor contract. *See Gracey*, 868 F.2d at 674; *Hart*, 1999 WL 33839612 at *2.

Section 6707(c)(2) is titled "Exception." It provides that "this subsection" (*i.e.*, § 6707(c)) does not apply if the Secretary of Labor, after a hearing held in accordance with regulations, determines that the wage rates under the predecessor contract are "substantially at variance" with wages and benefits prevailing in the locality.[6]

The dispute here is over the scope of the Secretary's authorization to hold a substantial variance hearing under § 6707(c)(2), and the power of the Court to enjoin a hearing challenged as *ultra vires*.

---

[6] I am primarily concerned with the statute Congress enacted, not with the background debate. Legislative history does shed light, however, on the problem that Congress sought to address and the competing policy goals embodied in the statute as passed. During Congressional hearings on the 1972 amendments, at least one Senator was concerned that new bidders for government contracts would underbid incumbents simply by slashing wages. *See McLucas*, 364 F. Supp. at 768 n.16. Without some sort of floor, the collective bargaining exception could swallow the prevailing wage rule. At the time, DOL had reportedly failed even to determine the prevailing local wage rate as to almost two-thirds of the covered contracts. *Id.*

7

### B. The Parties' Interpretations of § 6707(c)(2)

#### 1. CCA

CCA begins with section 6707(c)(1), which states the general rule that a successor contract cannot set a wage rate that is below the rate in its predecessor contract. Fine, says CCA; these contracts do not do that. Wages escalate each year, from $20.00 per hour before the new collective bargaining agreement, to $20.40 in 2013, to $20.71 in 2014, to $21.02 in 2015. (Compl. ¶¶ 20–22) No successor contract actually cuts wage rates below those in its predecessor.[7]

The section 6707(c)(2) "exception," argues CCA, must be understood as an exception to the (c)(1) wage floor. That is, (c)(2) sometimes permits a successor contract to go below that (c)(1) wage floor—specifically, when an ALJ determines after a hearing that the floor is higher than prevailing wage rates. But CCA did not need to resort to the (c)(2) "exception" to justify these contract rates, because they do not go below the (c)(1) wage floor.

It follows, says CCA, that (c)(2) does not provide authorization for an administrative hearing to determine whether their collectively bargained wage rates substantially vary from the prevailing rates in the area. To put it another way, CCA reads (c)(2) to authorize a substantial variance hearing only for the benefit of a successor contractor which seeks to pay wage rates *lower* than those in the predecessor contract. CCA relies heavily on the Fourth Circuit's

---

[7] According to UGSOA, the issue of whether the new contract is better or worse than its predecessor is not quite so cut-and-dried as presented. The predecessor union, says UGSOA, had originally negotiated a CBA that included a wage progression from $18.00 to $29.93 between 2009 and 2012. (McGurkin Decl. Ex. 5 at 2) UGSOA further alleged to the Wage and Hour Division that cost pressures from ICE resulted in CCA and the previous union's agreement to modify the CBA and reduce wages to $20.00. (*Id.* at 2–3) UGSOA also claimed that, despite the alleged substantial variance, they signed the current CBA because it "was better than no CBA." (*Id.* at 3) The legal significance of these contentions is not explored here, but might be explored in any (c)(2) hearing.

decision in *Gracey*, which held that "[t]he language, context, and legislative history of the Service Contract Act lead to but one conclusion:... no power vests in the Secretary to set aside an arms-length collective bargaining agreement *solely* because wages are below the prevailing rate." 868 F.2d at 677 (emphasis added); *see* Pl. Opp'n Br. Mot. Dismiss 4-5 (ECF No. 32).

CCA therefore contends that a "substantial variance" hearing would be *ultra vires,* and seeks to enjoin DOL from holding such a hearing.

### 2. DOL

But wait a minute, says DOL. Section 6707(c)(2) does not state that a hearing cannot be held unless a contract's wage rates are lower than the predecessor contract's rates (or for that matter lower than prevailing rates.) Rather, (c)(2) provides for a hearing to determine if the predecessor contract rate and the prevailing rate are "substantially at variance" with each other. That language, according to DOL, is broad enough to encompass hearings to investigate variances among the predecessor rate, the current rate, and prevailing wages. (*See, e.g.*, Def. Br. Mot. Dismiss 29–30 (ECF No. 27–1))

After such a hearing, CCA might prevail on the merits, or it might not. But the likelihood (or even near certainty) of one party or the other's prevailing does not preclude the DOL from hearing the case at all. (And indeed, it appears from the language of (c)(2) that the Secretary cannot act at all without holding a hearing.) Should the Agency rule in CCA's favor, rightly or wrongly, then there is no harm; should the agency mistakenly rule against CCA (and CCA suggests that any such adverse ruling would be mistaken), then CCA can appeal, first within the agency, and ultimately to the Court of Appeals. (Def. Reply Br. 5–7 (ECF No. 33)) Either way, there is no immediate harm requiring this Court's intervention

DOL therefore argues that this Court lacks subject matter jurisdiction over this dispute and that CCA has failed to state a claim upon which relief may be granted.

## III.   SUBJECT MATTER JURISDICTION

### A. Standard of Review

A challenge to jurisdiction may be brought under Fed. R. Civ. P. 12(b)(1), on either a factual or facial basis. *See* 2 Moore's Federal Practice § 12.30[4] (3d ed. 2007); *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). A facial challenge asserts that the complaint does not sufficiently allege grounds for subject matter jurisdiction. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action,* 678 F.3d 235, 243 (3d Cir. 2012). A court considering such a facial challenge "appl[ies] the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6)." *Aichele,* 757 F.3d at 358. That is, a court must assume the truth of the allegations in the complaint and the documents it attaches or relies upon.[8] Construing such allegations in the light most favorable to the plaintiff, the court may dismiss the complaint only if it nevertheless appears that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction. *Id.* at 358–59. "With respect to 12(b)(1) motions in particular, the plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." *In re Schering Plough,* 678 F.3d at 244 (internal quotations marks omitted). I consider DOL's motion a facial challenge because the relevant jurisdictional facts are not materially disputed. *Aichele,* 757 F.3d at 358–59; (*see* Def. Br. Mot. Dismiss 15; Pl. Opp'n Br. Mot. Dismiss 2, 30).

CCA's complaint generally asserts that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337,[9] and 1361. (Compl. ¶6) It

---

[8] *See* n. 2, *supra*.

[9] The citation of 28 U.S.C. § 1337 "is superfluous," 13D Charles Alan Wright & Arthur R. Miller, *et al.,* Federal Practice & Procedure § 3574 (3d ed. 1998), because the Supreme Court has "not distinguished between the 'arising under' standards of § 1337 and § 1331." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S.*

asserts that the court has subject matter jurisdiction under the following theories: (1) *Kyne* jurisdiction; (2) the judicial review section of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706; and (3) mandamus, *see* 28 U.S.C. § 1361. (Pl. Opp'n Br. Mot. Dismiss Section II)

### B. *Kyne* Jurisdiction

*Leedom v. Kyne*, 358 U.S. 184, 79 S. Ct. 180 (1958), recognized a district court power to review agency actions allegedly taken "in a blatantly lawless manner or contrary to a clear statutory prohibition." *Hindes v. F.D.I.C.*, 137 F.3d 148, 164 (3d Cir. 1998); *accord Rhode Island Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002). That jurisdiction is narrow and "very limited." *Confederated Indep. Unions v. Rockwell-Standard Co.*, 465 F.2d 1137, 1141 (3d Cir. 1972). It was on the basis of *Kyne* that *Gracey,* on which CCA relies, concluded that "if an agency acts in clear derogation of its statutory authority, a court need not wait for the underlying proceedings to conclude to intervene." *Gracey*, 868 F.2d at 674 n.1.

So-called "*Kyne* jurisdiction" is ill-defined (and its contours have evolved, *see infra*).  It has been deemed a form of "inherent jurisdiction," *Clinton County Comm'rs v. U.S. E.P.A.*, 116 F.3d 1018, 1028 (3d Cir. 1997), or a "non-statutory" form of review, *Chamber of Commerce of the U.S. v. Reich,* 74 F.3d 1322, 1327–28 (D.C. Cir. 1996). It might also be seen as a species of 28 U.S.C. § 1331 jurisdiction over questions concerning a federal statute. Some cases have suggested that it be treated as not jurisdictional, but substantive.[10] For present purposes, however, the characterization is not critical.

---

*California*, 463 U.S. 1, 8 n.7, 103 S. Ct. 2841, 2845 (1983). I therefore do not discuss § 1337 separately from § 1331.

[10] Long after *Kyne* was decided, the Supreme Court announced a bright line rule that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516, 126 S. Ct. 1235, 1245 (2006). Some Circuits have suggested that this approach might undermine *Kyne*'s status as a

11

### 1. The *Kyne* line of cases

In *Kyne*, the NLRB defined a commingled bargaining unit comprising both professional and nonprofessional employees. 358 U.S. 184, 79 S. Ct. 180. Absent majority consent of the professional employees, that is a clear violation of Section 9(b) of the National Labor Relations Act.[11] An organization of professional employees asked for an election to determine whether, in the words of the statute, "a majority of such professional employees vote for inclusion in such unit." *Id.* at 185–86, 79 S. Ct. at 182. The NLRB refused to hold the vote, included the professional employees in the bargaining unit, directed a bargaining unit election, and certified the result. *Id.*

---

jurisdictional case. *See Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 232 (4th Cir. 2008); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 188–90 (D.C. Cir. 2006). If so, then the source of jurisdiction in a *Kyne* case would be regarded as 28 U.S.C. § 1331, and *Kyne* itself could be viewed as substantive. Supreme Court and Third Circuit precedents, however, have consistently addressed *Kyne* in the context of subject matter jurisdiction. *See, e.g., Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 42–44, 112 S. Ct. 459, 465–66 (1991) (reversing determination that district court had jurisdiction under *Kyne*); *McDougal-Saddler v. Herman*, 184 F.3d 207 (3d Cir. 1999) (affirming district court dismissal for lack of subject matter jurisdiction); *Clinton County*, 116 F.3d at 1029 ("we hold that the *Kyne* doctrine does not confer federal court jurisdiction over plaintiffs' suit"). Although these precedents predate *Arbaugh*, they have not been limited or overruled, so I remain bound by them as jurisdictional precedent.

If *Kyne* is not jurisdictional as such, then I must treat DOL's contentions, not as a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), but as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Arbaugh* listed three reasons that the distinction could matter: (1) subject matter jurisdiction cannot be waived; (2) factual subject matter jurisdiction challenges may authorize judges to review jurisdictional evidence; and (3) a dismissal for lack of subject matter jurisdiction may also extinguish supplemental jurisdiction over pendent state-law claims. 546 U.S. at 514, 126 S. Ct. at 1244–45. None of those distinctions are relevant here. Particularly because I am confining myself to the face of the pleadings, the analysis would be much the same.

[11] *See* 29 U.S.C. § 159(b) ("the Board shall not (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit").

A representative of the aggrieved professionals sued in district court. The district court set aside the NLRB's determination of the commingled bargaining unit, as well as the election and the certification. *Id.* at 186–87, 79 S. Ct. at 182–83. The NLRB members, on appeal, did not contest the district court's conclusion that "the Board, in commingling professional with nonprofessional employees in the unit, had acted in excess of its power and had thereby worked injury to the statutory rights of the professional employees. Instead, it contended only that the District Court lacked jurisdiction to entertain the suit." *Id.* at 187, 79 S. Ct. at 183.

As the Supreme Court recognized, NLRB representation certifications generally may be judicially reviewed only when they achieve the status of final agency orders, and then only in the Court of Appeals. *See id.* at 187–88, 79 S. Ct. at 183 (citing NLRA § 9, codified at 29 U.S.C. § 159(d)). The Court found, however, that this situation was different. This, it said, was an independent action "to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act." *Id.* at 188, 79 S. Ct. at 184. Critical to the Court's reasoning was its conclusion that "the absence of jurisdiction of the federal courts meant a sacrifice or obliteration of a right which Congress had created." *Id.* at 190, 79 S. Ct. at 184 (quoting *Switchmen's Union of North America v. National Mediation Board*, 320 U.S. 297, 300, 64 S. Ct. 95, 97 (1943)). In such a case, it concluded, the general jurisdiction of the district courts would extend to ensure that "an express statutory right" would be enforceable "under the general jurisdiction of the district courts." *Clinton County*, 116 F.3d at 1028 (citing *Kyne* 358 U.S. at 190, 79 S. Ct. at 184–85).

In *Briscoe v. Bell,* 432 U.S. 404, 97 S. Ct. 2428 (1977), the Court strongly suggested that *Kyne* jurisdiction would not be inferred in the face of a contrary statutory command. There, the State of Texas asserted in district court that the Attorney General had exceeded his authority in determining that Texas was covered by the Voting Rights Act. *Briscoe*, at 406–07, 97 S. Ct. at 2430. By statute, however, such a determination is "not reviewable in any Court," 42

U.S.C. § 1973b(b). And that statute, said the Court, reflected a specific Congressional intent to "eradicate the blight of voting discrimination with all possible speed" by preventing judicial delays in implementation of the VRA. *Id.* at 410, 97 S. Ct. at 2431. The Supreme Court therefore held that *Kyne* jurisdiction did not apply. *Id.* at 413 n.13, 97 S. Ct. at 2433.

The Supreme Court revisited *Kyne* jurisdiction in *MCorp,* 502 U.S. 32, 112 S. Ct. 459. In *MCorp*, a bank holding company, then in Chapter 11 bankruptcy proceedings, sued in district court to enjoin the Board of Governors of the Federal Reserve System (the "Board") from prosecuting administrative proceedings in which the bank was accused of violating the so-called "source of strength" regulation. *Id.* at 34, 112 S. Ct. at 461. The bank claimed, and the district court agreed, that the administrative proceedings were *ultra vires* because the source of strength regulation as promulgated exceeded the Board's statutory authority. *See id.* at 36, 112 S. Ct. at 462.

On appeal, the Court of Appeals agreed with the Board that injunctions against pending administrative actions of the Board were precluded by the Federal Institutions Supervisory Act (FISA), 12 U.S.C. § 1818(i)(1). *Id.* at 36–37, 112 S. Ct. at 462. The Court of Appeals nevertheless upheld the district court's exercise of jurisdiction under *Kyne,* which it interpreted "as authorizing judicial review of any agency action that is alleged to have exceeded the agency's statutory authority." *Id.* at 43, 112 S. Ct. at 465.

*MCorp* reversed the Court of Appeals and denied district court jurisdiction, adopting a far narrower view of *Kyne.* In doing so, *MCorp* distinguished *Kyne* in two critical respects.

First, it said, *Kyne* had found that the NLRB's interpretation of the statute "would wholly deprive the union of a meaningful and adequate means of vindicating its statutory rights." *Id.* at 43, 112 S. Ct. at 465–66. The *MCorp* Court found no such deprivation in the case before it. Rather, it found that the availability of appellate review weighed against the implication of a redundant district court remedy under *Kyne*:

14

> The cases before us today are entirely different from *Kyne* because FISA expressly provides MCorp with a meaningful and adequate opportunity for judicial review of the validity of the source of strength regulation. If and when the Board finds that MCorp has violated that regulation, MCorp will have, in the Court of Appeals, an unquestioned right to review of both the regulation and its application.

*Id.* at 43–44, 112 S. Ct. at 466. That holding—that eventual Court of Appeals review of a final agency decision is a sufficient remedy—seems to have narrowed *Kyne* (in which the professional employees were also entitled to Court of Appeals review of a final order). And it applies here: any final agency decision that follows a hearing under § 6707(c)(2), whether in favor of the DOL or in favor of CCA, would be reviewable by the Court of Appeals under the APA. *See* Section III.B.2.ii, *infra.*

Second, in *MCorp* a statute explicitly denied the federal courts jurisdiction to give interim relief. 502 U.S. at 44, 112 S. Ct. at 466. Thus *Kyne* jurisdiction would need to have arisen, not in silence, but in the more hostile environment of an expressly contrary statute. *See, e.g., Briscoe, supra.* That explicit-prohibition factor is not present in this case.

Post-*Briscoe* and *MCorp*, then, it is probably the rare case in which a court would find implied *Kyne* jurisdiction despite a jurisdiction-denying statute. As it happens, cases since *MCorp* in the Third Circuit have generally involved an explicit statutory prohibition of court intervention—the easiest case under *MCorp*. Consequently, they have not always explored other facets of the *MCorp* and *Kyne* analysis. *See McDougal-Saddler,* 184 F.3d at 213–14 (holding that 5 U.S.C. § 8128(b) clearly "bar[s] judicial review altogether" of certain workers' compensation decisions, a mandate that *Kyne* cannot overcome); *see also Clinton County,* 116 F.3d at 1028–29 (sovereign immunity bars CERCLA action where statute explicitly removed federal court jurisdiction until EPA remediation was complete, a clear statutory statement that bars *Kyne* jurisdiction).

15

In *Hindes,* however, the Third Circuit discussed the *Kyne/MCorp* factors more comprehensively in the course of denying jurisdiction. 137 F.3d 148. First, reviewing the same statute at issue in *MCorp,* the Third Circuit found that it clearly withdrew jurisdiction to review the FDIC's issuance of a Notification that a bank did not meet capital requirements. 137 F.3d at 163–65; *see* 12 U.S.C. § 1818(i)(1). But the Court did not stop there. Second, *Hindes* held that the FDIC "did not act in a blatantly lawless manner" when it served a Notification that the bank's capitalization was inadequate. *Id.* at 165. Third, *Hindes* held that although the bank had no avenue of appeal or other relief from the Notification (indeed, it had been driven out of business), it still had an adequate remedy: the bank could bring a separate action for damages based on the FDIC's allegedly wrongful conduct. *Id.* Those factors, taken together, led the court to deny *Kyne* jurisdiction.

Even absent a jurisdiction-denying statute, other courts have found the remaining *Kyne/MCorp* factors sufficient to justify withholding *Kyne* jurisdiction—particularly where the asserted right could be vindicated in an eventual appeal (albeit after the expense and inconvenience of administrative proceedings). *See, e.g., Detroit Newspaper Agency v. NLRB,* 286 F.3d 391, 398–401 (6th Cir. 2002) (because appellate court may review adverse ruling by the administrative body, *Kyne* does not confer district court jurisdiction). (*Detroit Newspaper* and other cases denying jurisdiction are further discussed *infra.*)

On the other hand, when withholding immediate relief would *itself* work a substantial and serious deprivation of a statutory or constitutional right, the courts tend to uphold *Kyne* jurisdiction. For example, the First Circuit permitted judicial intervention in a case where the right at issue, the State's sovereign immunity, was meant to protect the State from being sued at all: "[A] state's sovereign rights encompass more than a mere defense from liability—they include an immunity from being haled before a tribunal by private parties—those rights would be lost without an early and authoritative ruling." *Rhode Island Dep't of Envtl. Mgmt.,* 304 F.3d at 43. *Kyne* jurisdiction likewise

16

will tend to be found where there is no appellate remedy at all, so a district court's intervention is the only means of remedying a deprivation of a right conferred by Congress. *See, e.g., Hanauer v. Reich,* 82 F.3d 1304, 1308–09 (4th Cir. 1996) (holding that *Kyne* allowed for a "cursory review of the merits" because there was no possibility of appellate court review); *United States v. Bozarov,* 974 F.2d 1037, 1045 n.8 (9th Cir. 1992) (because doctrines like *Kyne* jurisdiction provide some judicial review when appellate court review is precluded by statute, that preclusion does not violate the non-delegation doctrine).

### 2. Application of *Kyne* to this case

I synthesize the foregoing case law as follows. Where, as here, there is no jurisdiction-denying statute, a court considering whether *Kyne* jurisdiction applies must consider (a) whether the agency is allegedly acting in a "blatantly lawless manner," or "contrary to a clear statutory prohibition";[12] (b) whether the plaintiff has a "meaningful and adequate" alternative remedy such as an appeal;[13] and if so, (c) whether, in the interim, denial of jurisdiction would nevertheless work an immediate "sacrifice" or "obliteration" of an express statutory or constitutional right.[14] Factors (b) and (c) are closely interrelated, because an immediate and irreparable deprivation would also tend to render any subsequent appellate remedy inadequate.

### i.   *Lawless agency action*

The agency action challenged here is the convening of a "substantial variance" hearing pursuant to 41 U.S.C. § 6707(c)(2). *Kyne* jurisdiction is

---

[12] *Hindes,* 137 F.3d at 164.

[13] *Id.; MCorp,* 502 U.S. at 43–44, 112 S. Ct. at 466.

[14] *Kyne,* 358 U.S. at 190, 79 S. Ct. at 184–85; *see also Detroit Newspaper,* 286 F.3d at 398.

appropriate only if calling such a hearing is "blatantly lawless" or "contrary to a clear statutory prohibition." *Hindes*, 137 F.3d at 164.

"Blatantly lawless" or "contrary to a clear statutory prohibition" sets a high bar, one higher than mere error. In *Hindes,* for example, the bank protested the FDIC's service of a Notification that it was in unsafe capital condition. *Id.* at 159. The FDIC, it said, had acted unlawfully in serving the Notification; it had reneged on an agreement, and had erred in refusing to credit certain goodwill. *Id.* at 153–54. In short, there was no capital crisis and therefore no authorization for service of the Notification, which resulted in the bank's closure. *Id.*

Nevertheless, said *Hindes*, the FDIC's action was not blatantly lawless; the agency, even if it erred, had acted "pursuant to the requirement that it notify a financial institution upon making a determination that the financial institution was operating in an unsafe financial condition. *See* 12 U.S.C. § 1818(a)(2)." *Id.* at 165. Because the FDIC had taken the kind of action it is authorized to take, the bank's contention that the Notification was wrongful would not furnish the basis for immediate *Kyne* jurisdiction, but would have to await some other remedy. (In that case, there was not even a potential appeal remedy, but the Court found it sufficient that the bank could eventually bring an action for damages against the FDIC. *Id.*)

As I interpret "blatantly lawless" or "contrary to statute," then, the proposed agency action must constitute an immediate, perhaps irremediable, contravention of a clear statutory mandate. Otherwise, the statutory scheme—initial review at the administrative level, followed by Court of Appeals review—cannot be overcome, and must be honored.

Is there such a clear statutory prohibition barring DOL from convening a hearing?

I start from 41 U.S.C. § 6707(a):

(a) Enforcement of Chapter.—

18

> Sections 6506 and 6507 of this title govern the Secretary's authority to enforce this chapter, including the Secretary's authority to prescribe regulations, issue orders, *hold hearings*, make decisions based on findings of fact, and take other appropriate action under this chapter.

(Emphasis added). I read that as an incorporation of the agency's delegated power to convene hearings. Section 6707 confers a broad power, not narrowly limited in advance as to subject matter. One of the incorporated sections, 41 U.S.C. § 6506, is likewise commodious; it confers plenary power to promulgate regulations, and provides that the Secretary may "make investigations and findings as provided in this chapter and may, in any part of the United States, prosecute an inquiry necessary to carry out this chapter." The other cited statute, 41 U.S.C. § 6507, contains a similarly broad delegation of power to hold hearings:

> (b) Authority To Hold Hearings.—The Secretary or an impartial representative designated by the Secretary may hold hearings when there is a complaint of breach or violation of a representation or stipulation included in a contract under section 6502 of this title. The Secretary may initiate hearings on the Secretary's own motion or on the application of a person affected by the ruling of an agency of the United States relating to a proposal or contract under this chapter.

41 U.S.C. § 6507(b).

CCA focuses on § 6707(c)(2) itself, which states that subsection (c) "does not apply *if the Secretary finds after a hearing in accordance with regulations adopted by the Secretary* that wages and fringe benefits under the predecessor contract are substantially at variance with wages and fringe benefits prevailing in the same locality for services of a similar character." (Emphasis added.) A hearing may be convened in error in a particular case, but I do not read (c)(2) as limiting the Secretary's authority to hold hearings *per se*. Section (c)(2) seems to go no farther than to say that any finding of substantial variance must be preceded by a hearing. It is not prohibitory; it contains nothing like the language of the NLRA at issue in *Kyne*. See 29 U.S.C. § 159(b) ("The Board

19

shall not …"). And Section (c)(2) generally defers to the necessity that any hearing be in accordance with "regulations," which it does not cite. In short, (c)(2) does not purport to delimit agency authority as such.

The statutory language, says DOL, is broad enough to require deference to the regulations enacted by the department. (*See, e.g.,* Def. Br. Mot. Dismiss 28–30) DOL cites 29 C.F.R. § 4.10. Section 4.10(a) recites general statutory requirements—not only of "section 4(c) of the Act" [*i.e.,* 41 U.S.C. § 6707(c)], but also of "sections 2(a)(1) and (2) of the Act" [*i.e.,* 41 U.S.C. § 6703(1)–(2)]. These sections, it says, provide that contractors "generally are obliged to pay to service employees employed on the contract work wages and fringe benefits not less than those to which they would have been entitled under a collective bargaining agreement if they were employed on like work under a predecessor contract in the same locality." The regulation then quotes verbatim the "exception" of Section 4(c) of the Act [*i.e.,* § 6707(c)(2)].[15]

The following regulatory subsection, 29 C.F.R. § 4.10(b), is entitled "*Prerequisites for a Hearing.*" It states only one prerequisite: "A request for a hearing under this section may be made by the contracting agency or other person affected or interested, including contractors or prospective contractors and associations of contractors, representatives of employees, and other interested Governmental agencies." That request must be "in writing." 29 C.F.R. § 4.10(b)(1)(i).

---

[15] In this connection, DOL cites the Senate Report's "Section-by-Section Analysis," which states that the committee intends for the substantial variance hearing proviso to apply, not only to the (c)(1) predecessor contract wage floor, but also to the minimum wage and fringe benefit specification sections (now at 41 U.S.C. §§ 6703). (Def. Br. Mot. Dismiss 46 (citing 1972 U.S.C.C.A.N. at 3537)); *see also Gracey,* 868 F.2d at 681–82 (Phillips, J., dissenting). I add that the statute might also be broad enough to permit the DOL to make its own determination as to whether a contract was truly the product of arm's length collective bargaining; whether a *package* of wages and benefits, taken as a whole, is in fact more favorable or less favorable than its predecessor; or whether the new contract in fact covers the same services as the old. Such determinations might require more than an arithmetic comparison between the new hourly wage rates and the old.

I conclude that DOL (like the FDIC in *Hindes*), even if it erred, was not acting "lawlessly," but within the scope of its general statutory and regulatory power to investigate and hold hearings. I am not suggesting that CCA does not have a respectable argument. Some hearings convened by the Department may turn out to be mistaken or unnecessary; some may result in a rout in the employer's favor. The agency does, however, have broad power to convene hearings on this subject.

I see no clear statutory prohibition of the "No hearing shall be held" variety. I do see a statutory scheme that initially commits these hourly-wage matters to the DOL, reserving court challenges for later. I cannot conclude that the DOL, even if it has misjudged, is acting so clearly in excess of its authority as to be "lawless."

### ii. *Alternative appellate remedy*

I may assume *arguendo,* however, that DOL is exceeding its statutory mandate. Even so, the appropriateness of *Kyne* jurisdiction depends greatly on whether the plaintiff lacks any sufficient alternative remedy. *Kyne* jurisdiction, remember, is designed to remedy a deprivation "of a meaningful and adequate means of vindicating [] statutory rights." *MCorp*, 502 U.S. at 43, 112 S. Ct. at 465–66. *Kyne* is generally invoked only as a backstop, when there is an express or implied *preclusion* of judicial review, and lawless action threatens. *Chamber of Commerce*, 74 F.3d at 1330. Here, however, CCA does have a remedy in the form of an appeal from a final order.

The chief source of potential injury to CCA—and what lies behind its desire for an injunction—is not the hearing itself, but the possibility of an adverse ruling after such a hearing. If the ALJ's ruling (whether favorable or unfavorable) were legally correct, then of course CCA would have no cognizable injury. But for purposes of argument I consider CCA's position that a ruling adverse to itself would necessarily be erroneous.

21

CCA does not dispute that, should the agency find a substantial variance or strike down any part of the collective bargaining agreement, it may appeal that final decision to the Court of Appeals under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. *See Chehazeh v. Attorney Gen. of U.S.*, 666 F.3d 118, 126–27 (3d Cir. 2012) (APA permits judicial review of final agency actions as long as no statutes preclude review and the action is not committed to agency discretion by law); *C&E Servs., Inc. of Washington v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) ("Under the SCA, the Department of Labor's administrative determinations are judicially reviewable.").

But the very foundation of *Kyne* jurisdiction, at least as currently understood, is the lack of any recourse. Case after case has held that the possibility of an appeal of final agency action to the Court of Appeals weighs heavily against *Kyne* jurisdiction. *MCorp, supra*; *Detroit Newspaper*, 286 F.3d at 398–401 (6th Cir. 2002); *see also* cases cited in the following subsection, III.A.2.iii. [16] And it weighs against *Kyne* jurisdiction here.

---

[16]     The U.S. Supreme Court has viewed a similar problem through the lens of administrative law, and arrived at a parallel result. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13, 114 S. Ct. 771, 779 (1994). There, the petitioner, a mine owner, sought in district court to enjoin the designation of union representatives as violative of its rights under the National Labor Relations Act—an issue reminiscent of the one in *Kyne*. The Supreme Court upheld the denial of district court jurisdiction. Congress, it held, had promulgated a statutory scheme whereby the only court review would be Court of Appeals review of final orders—what it called "delayed judicial review of final agency actions." *Id.* at 207, 114 S. Ct. at 776. In such a case, the Court said, it would find "that Congress has allocated initial review to an administrative body" where that intent was discernible from the statutory scheme. *Id.* That Congressional intent would be undermined by permitting interim intervention by the district courts. True, the Court pointed out, there had been exceptions; the courts had taken jurisdiction of "collateral" issues, outside the agency's expertise, that would otherwise evade review. *Id.* (citing, *inter alia, Kyne*). This case, however, did not fall within any such exception.

The Court examined the claims of the petitioner (1) that the designation of a union under the Mine Act "violate[d] the principles of collective bargaining under the NLRA and petitioner's right to exclude nonemployee union organizers from [its] property" and (2) that confining petitioners to the usual statutory review scheme

Even where an appellate remedy is available, however, the court must still consider whether it is an "adequate and meaningful" remedy. That issue is intertwined with factor (c), and I discuss it in the following subsection.

### iii.   *Immediate obliteration of statutory right*

*Kyne* jurisdiction is intended to prevent the immediate loss or obliteration of a clear statutory right. For the reasons stated above, the risk of an erroneous outcome is not the kind of deprivation that would empower a district court to enjoin an administrative hearing. The appellate process exists to correct that kind of error.

CCA maintains, however, that the mere convening of a hearing would immediately harm it in ways that cannot be meaningfully corrected by an administrative appeal, *see* 29 C.F.R. § 6.56, followed by Court of Appeals review of final agency action. CCA argues that a (c)(2) hearing, in itself, would irreparably damage its relationship with its employees, its bargaining relationship with UGSOA, and its statutory collective bargaining rights, 29 U.S.C. §§ 151, 157. (*See* Compl. ¶¶29, 34; Pl. SJ Br. 18–19, 21–22; Pl. Opp'n Br. Mot. Dismiss 32–33, 35–36)

Those claims of impairment of collective bargaining rights are reminiscent of those in *Thunder Basin, see* n.16, *supra.* There, they were found inadequate to overcome the presumption that the statutory scheme of initial administrative review, followed by a judicial appeal, would be followed.

The Third Circuit's *Hindes* case, cited above, also suggests that CCA's concerns are overstated. There, service of a Notification that the bank had been

---

would deprive them of meaningful review, and therefore violate the due process clause. *Id.* at 213–14, 114 S. Ct. at 779–80. The Court held that it was appropriate to let the agency hear the first issue exclusively, because it lay within the agency's expertise and was committed to it both by statute and regulation. Even the second issue, despite its constitutional dimension, could be heard by the Commission, but ultimately it did not matter; "Even if this were not the case, however, petitioner's statutory and constitutional claims here can be meaningfully addressed in the Court of Appeals." *Id.* at 215, 114 S. Ct. at 780.

found financially insecure had immediate, severe consequences: it set off a run on deposits, destruction of security relied on by bondholders, and closure of the bank. 137 F.3d 148. Moreover, the bank had no remedy, not even an appellate one, for an erroneous Notification. *Id.* at 164. Nevertheless, the Third Circuit said, the possibility of a suit for damages meant that the bank was not without recourse. *Id.* at 165.

At least two Courts of Appeals other than the Third have likewise rejected claims of immediate damage similar to CCA's.

In *Detroit Newspaper, supra,* the Sixth Circuit vacated a district court's assertion of *Kyne* jurisdiction to enjoin an NLRB proceeding. The statute at issue, it said, provided for judicial review after exhaustion of administrative relief. 286 F.3d 391. Thus the issue was bound up with the requirement of exhaustion of administrative remedies: "the exhaustion requirement of allowing the administrative body to rule in the first instance 'cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage.'" 286 F.3d at 400 (quoting *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 58 S. Ct. 459 (1938)). In the Sixth Circuit's view, the Supreme Court exhaustion case law foreclosed any argument that the hearing itself would render future appellate court review inadequate. *Id.* at 401. For these purposes, administrative proceedings constitute a transaction cost, not irreparable damage. *Kyne* jurisdiction was therefore inappropriate.

The Fourth Circuit rejected a similar but more statute-based argument in *Long Term Care Partners, LLC v. United States,* 516 F.3d 225 (4th Cir. 2008). There, federal employees brought an EEOC complaint, alleging that the risk-based selection process, by which they were denied long term care insurance, unlawfully discriminated on the basis of disability. The insurer sought to enjoin the EEOC's assertion of jurisdiction, citing a federal statute providing that the employees' eligibility for benefits "shall be subject to review only to the extent

24

and in the manner provided in the applicable master contract." 516 F.3d at 234 (quoting 5 U.S.C. § 9003(c)(2)).

*Long Term Care* questioned whether EEOC jurisdiction was truly barred, but more relevant here is its holding that, under *Kyne,* there was no immediate deprivation that lacked a meaningful remedy. *Id.* at 236 (part III.B. of opinion). The deprivation, said the insurer, was denial of its statutory right, which it portrayed as a kind of quasi-immunity, to be free of review by the EEOC. In rejecting that contention, *Long Term Care* usefully distinguished *Rhode Island Dep't of Envtl. Mgmt.*, 304 F.3d at 43, cited above. There, the First Circuit upheld immediate *Kyne* review of the agency's decision to pursue administrative proceedings against the State, despite the State's sovereign immunity. In such a case, an ultimate appeal is not an adequate remedy; sovereign immunity is the State's absolute privilege not to be brought before a tribunal *at all* without its prior consent. The *Long Term Care* insurer's claim of ultra vires action did not share either the constitutional scope or the underlying rationale of sovereign immunity. 516 F.3d at 236–37. The rights claimed by the insurer could be adequately vindicated in the ordinary course, without extraordinary intervention under *Kyne*.

I disagree with CCA that convening a (c)(2) hearing would constitute an immediate deprivation of a statutory right that cannot meaningfully be corrected on appeal. In so claiming, CCA divorces the merits of the case from the hearing itself. As to sovereign immunity, or some other explicit immunity from suit, that distinction is maintainable; here, not. I reject the distinction as overblown.

The alleged statutory right not to be subjected to a (c)(2) hearing, first of all, is not expressed in the statute as an immunity. CCA's contention here is much closer to the idea that it would inevitably prevail at such a hearing, and therefore should not be subjected to it. But if the ALJ, the agency on appeal, or the Court of Appeals on ultimate review should agree with CCA, then it has lost

nothing but the time and expense of administrative proceedings. Any litigant who prevailed in agency proceedings could say the same.

CCA's alleged "loss" of the statutory right to collective bargaining, too, is overstated.[17] The convening of a (c)(2) hearing, without more, deprives CCA of nothing for which it bargained. Again, the claim of deprivation really looks forward to a hypothetical adverse result, correctable on appeal.

At oral argument, CCA cited the uncertainty and lack of finality that would be created if a union could bargain for a package of wages and benefits, pocket the benefits, and then petition the DOL to boost the wage rate.[18] Once again, there is no clear deprivation of a statutory right there; an erroneous result, not a hearing *per se,* is what CCA truly fears. And asking is not getting. If the union is not entitled to a higher wage rate, it should not be able to obtain a higher rate from the DOL. And if an ALJ enters an erroneous order, it can be reversed.

Even the claim of interim *financial* harm—that DOL might (unlawfully, says CCA) nullify legitimately bargained-for wage rates simply because they are below prevailing rates—is overstated. (*See* Pl. Opp'n Br. Mot. Dismiss 32–33, 36) DOL regulations state that "variance decisions do not have application retroactive to the commencement of the contract." 29 C.F.R. § 4.163(c). Rather, new wage determinations in variance hearings are applied "as of the date of the Administrative Law Judge's decision or, where the decision is reviewed by the Administrative Review Board, the date of that decision." *Id.* And a party

---

[17] To begin with, the statutes cited by CCA speak in terms of employees, not employers. *See* 29 U.S.C. §§ 151, 157. But set that aside.

[18] As a tactic, this would be convoluted and rather risky. It would require a union, in return for other concessions, to accept a stalking-horse deal for below-market wages, trusting that the DOL would eventually void that part of the agreement and raise them. Since variance decisions are not retroactive, 29 C.F.R. § 4.163(c), the union members potentially would have to endure the below-market wages pending administrative review, successful or unsuccessful collateral trips to district court, and Court of Appeals review.

aggrieved by an administrative decision may always apply to the Secretary or the reviewing court for a stay pending appeal. *See* Fed. R. App. P. 18.

In summary, the mere threat of undergoing a (c)(2) hearing is not blatantly lawless; is subject to an alternative appellate remedy; and does not work a severe deprivation of a clear statutory right in the interim. *Kyne* jurisdiction is inappropriate here.

## C. The APA

The briefs of DOL and CCA also discuss the APA as grounds for subject matter jurisdiction. The APA, however, is not a jurisdictional provision—and at any rate it would require final agency action, which is not present here.

The Supreme Court long ago ruled that the APA is not a font of subject matter jurisdiction. *See Califano v. Sanders*, 430 U.S. 99, 105–07, 97 S. Ct. 980, 985 (1977). Rather, it is 28 U.S.C. § 1331 which "'confer[s] jurisdiction on federal courts to review agency action....'" *Chehazeh*, 666 F.3d at 126 (citing *Califano*); *accord Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 401 (3d Cir. 2012). The Supreme Court has more generally declared that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516, 126 S. Ct. 1235, 1245 (2006). The Third Circuit has joined others in applying *Arbaugh* to the APA, treating its judicial review prerequisites (such as exhaustion of administrative remedies) as substantive, not jurisdictional, limitations. *Chehazeh*, 666 F.3d at 125 n.11 (citing cases from other Circuits).

It must be said, however, that courts have often treated the APA judicial review prerequisites—chiefly, the existence of final agency action—as jurisdictional.[19] Out of caution, I therefore briefly consider whether CCA has

---

[19] *See Treasurer of N.J.*, 684 F.3d at 401; *Chehazeh*, 666 F.3d at 125 n.11 (listing cases). *See also, e.g., Sharkey v. Quarantillo*, 541 F.3d 75, 88 (2d Cir. 2008) ("It is uncertain in light of [*Arbaugh*] whether these threshold limitations are truly

stated a claim under the APA—a potentially dispositive threshold issue, whether considered under Rule 12(b)(1) or 12(b)(6). Based on facts appearing on the face of the pleadings and contested by neither party, I find that CCA has not established the necessary prerequisite of final agency action.[20]

The APA provides for review of those actions "made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. I limit my discussion to the threshold question of whether there is final agency action because there is none here. "[F]inality is a threshold question because § 704 "limits causes of action under the APA to final agency action." *Ctr. for Food Safety v. Burwell*, No. CV 14-00267 (RC), 2015 WL 5185692, at *6 (D.D.C. Sept. 4, 2015) (citing *Trudeau*, 456 F.3d at 188); *see also Chehazeh*, 666 F.3d at 125 n.11. "To be a final action, the [agency action] must comply with the requirements of *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997)." *TSG Inc. v. U.S. E.P.A.*, 538 F.3d 264, 267 (3d Cir. 2008). "First, the action must mark the 'consummation' of the agency's decisionmaking process.... And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow...." *Bennett*, 520 U.S. at 177–78, 117

---

jurisdictional or are rather essential elements of the APA claims for relief."); *Long Term Care*, 516 F.3d at 232 (*Arbaugh* "called into question" Fourth Circuit precedent that the final agency action requirement of APA judicial review was jurisdictional). But the characterization has few consequences; to call APA jurisdictional is to defeat jurisdiction. There is no final agency action here. *See* Section III.C, *infra*.

DOL also briefly mentions the United States' sovereign immunity. (Def. Br. Mot. Dismiss 16) But the APA waives that sovereign immunity for nonmonetary claims. 5 U.S.C § 702; *see Treasurer of N.J.*, 684 F.3d at 397 ("the waiver of sovereign immunity in section 702 extends to all nonmonetary claims against federal agencies and their officers, regardless of whether or not the cases seek review of 'agency action' or 'final agency action' as set forth in section 704").

[20] Final agency action is considered under the Rule 12(b)(6) standard of review, which does not differ from the standard used above for facial Rule 12(b)(1) challenges. *See* Section III.A, *supra*; *Treasurer of N.J.*, 684 F.3d at 400 ("'final agency action' concerns whether a plaintiff has a cause of action under the APA that can survive a motion to dismiss under Rule 12(b)(6)").

S. Ct. 1168. Like a "collateral order" in federal court, an interim decision may under some circumstances be appealable; it must be shown, however, that it "would be effectively unreviewable on appeal from final judgment in the underlying action." *Chehazeh*, 666 F.3d at 135 (3d Cir. 2012) (internal quotation marks omitted); *see also Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 248 (3d Cir. 2011), *as amended* (Mar. 7, 2012).

CCA argues that the DOL's decision to hold a (c)(2) hearing represents administrative final action; that is, it is the DOL's definitive position on whether it can hold a hearing under the SCA. (*See* Pl. Opp'n Br. Mot. Dismiss 30–33) I disagree. Merely calling for a hearing—like the FDIC's serving the Notification in *Hindes*—is not an agency's final and definitive statement, but an initial step that sets an administrative process in motion. *Hindes*, 137 F.3d at 162 (citing *FTC v. Standard Oil Co.*, 449 U.S. 232, 241–43, 101 S.Ct. 488, 493–94 (1980)). It is not a decision that "impose[s] an obligation, den[ies] a right, or fix[es] some legal relationship as a consummation of the administrative process." *Id.* ([brackets] in original) (quoting *Shea v. Office of Thrift Supervision*, 934 F.2d 41, 44 (3d Cir.1991)). Merely forced to participate in administrative proceedings is not a collateral, appealable harm; if that were so, then almost all interim orders would be appealable.

Here, the final, reviewable decision would be a decision by the DOL—should it ever occur—to invalidate some portion of the wage schedule in the collective bargaining agreement. Simply calling for a hearing, like serving the Notification, was an unreviewable, interim step. "It is firmly established that agency action is not final merely because it has the effect of requiring a party to participate in an agency proceeding." *CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 30 (D.C. Cir. 2014).

In short, the requirement of final agency action would bar any cause of action under the APA.

### D. Mandamus

CCA, citing 28 U.S.C. § 1361,[21] also invokes mandamus jurisdiction. Mandamus is an "extraordinary remedy." *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 121, 109 S. Ct. 414, 424, (1988); *accord Semper v. Gomez*, 747 F.3d 229, 251 (3d Cir. 2014). "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief..." *Heckler v. Ringer*, 466 U.S. 602, 616, 104 S. Ct. 2013, 2022 (1984); *accord Semper*, 747 F.3d at 251.

Because there is no colorable entitlement to mandamus, this Court lacks jurisdiction. But whether jurisdictional or substantive, the prerequisites of mandamus are absent. For the reasons stated above, there is no danger of imminent lawless action or failure of a federal officer to perform a clear statutory duty. And where, as in this case, the plaintiff has not exhausted administrative remedies or his right to appeal under the APA, there is no situation requiring interim or emergent relief; a "grant of a writ of mandamus would be improper." *See Stehney v. Perry*, 101 F.3d 925, 934 (3d Cir. 1996).

## IV.  CONCLUSION

For the reasons set forth above, DOL's motion to dismiss is **GRANTED**. The complaint is dismissed in its entirety for lack of jurisdiction. In the alternative, it is dismissed for failure to state a claim. An appropriate order will issue.

Dated: December 18, 2015

**Hon. Kevin McNulty**
**United States District Judge**

---

[21] "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.